IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Dominique Turner, individually and as next friend of her minor children, TJ1, TJ2, TJ3, and TJ4,<br><br>*Plaintiff*,<br><br>-vs-<br><br>City of Chicago, David Alvarez, Jr., #16131, Bradley Anderson, #15660, Samuel Angel, #16501, Lucas Boyle, #12059, Cornelius Brown, #2235, Anthony Bruno, #1123, Brandon Campbell, #6278, Yvette Carranza, #13435, Danielle Cusimano, #16619, Emilio De Leon, #16360, Dervis Demirovic, #15664, Danielle Dunn, #9615, Damien Enoch, #12694, Dominic Ferro, #17503, Victor Guebara, #17147, Steven Holden, #8149, Andrew Khalifeh, #9557, Charles McClay, #4735, Aaron McClelland, #9164, Marco Mendoza, #1362, Antonio Miranda, #8264, Sean Ryan, #13198, Hugo Sanchez, #14269, Carlos Santamaria, #9919, Dimar Vasquez, #17910, Bryan Vielman, #18705, Curtis Weathersby, #7866, Scott Westman, #18472, and Russel Willingham, #511,<br><br>*Defendants.* | No. 21-cv-704<br><br>*(Judge Durkin)* |

## AMENDED COMPLAINT

This case concerns illegal and harassing home invasions conducted by Chicago police officers. Plaintiff explains below how officers terrorized plaintiff and her minor children in two illegal raids that violated the United States Constitution and the federal Fair Housing Act. The officers acted pursuant to widespread policies and practices of defendant City of Chicago

that Chicago Police Superintendent David O. Brown acknowledged in a public statement on January 20, 2021.

Plaintiff, by counsel and with leave of Court, files this amended complaint individually and for her four minor children and, by counsel, alleges as follows:

1. This is a civil action arising under 42 U.S.C. § 1983 and 42 U.S.C. § 3617. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 42 U.S.C. §3613.

2. Plaintiff Dominique Turner and her four minor children, TJ1, TJ2, TJ3, and TJ4, are residents of the Northern District of Illinois.

3. At the time of the events alleged in this complaint, TJ1 was 15 years old, TJ2 was 13 years old, and twins TJ3 and TJ4 were each 1 year old.

4. Plaintiff and her minor children are Black.

5. Plaintiff brings claims on her own behalf and for her minor children arising out of two illegal raids by Chicago police officers of plaintiff's dwelling in the 6800 block of South Dorchester Avenue in Chicago.

6. Plaintiff rented the second-floor unit and lived there with her minor children at the time of the events alleged in this complaint.

7. The residents of the first-floor unit are the plaintiffs in a pending lawsuit about the raids, *Archie v. Chicago*, 19-cv-4838.

8. Defendant City of Chicago is an Illinois municipal corporation.

9. Defendants David Alvarez, Jr., #16131, Bradley Anderson, #15660, Samuel Angel, #16501, Lucas Boyle, #12059, Cornelius Brown, #2235, Anthony Bruno, #1123, Brandon Campbell, #6278, Yvette Carranza, #13435, Danielle Cusimano, #16619, Emilio De Leon, #16360, Dervis Demirovic, #15664, Danielle Dunn, #9615, Damien Enoch, #12694, Dominic Ferro, #17503, Victor Guebara, #17147, Steven Holden, #8149, Andrew Khalifeh, #9557, Charles McClay, #4735, Aaron McClelland, #9164, Marco Mendoza, #1362, Antonio Miranda, #8264, Sean Ryan, #13198, Hugo Sanchez, #14269, Carlos Santamaria, #9919, Dimar Vasquez, #17910, Bryan Vielman, #18705, Curtis Weathersby, #7866, Scott Westman, #18472, and Russel Willingham, #511, were at all relevant times acting under color of their officers as Chicago police officers; they are sued in their individual capacities only.

### Raid of February 8, 2019

10. Defendants Anderson and Westman obtained the warrant for the raid on February 8, 2019; these defendants, along with defendants Alvarez, Angel, Brown, Bruno, Carranza, De Leon, Demirovic, Dunn, Enoch, Ferro, Guebara, Holden, Khalifeh, McClay, Mendoza, Santamaria, Vasquez, Vielman, Weathersby, and Willingham ("February 8, 2019 Officers") executed the warrant.

11. The warrant for the raid on February 8, 2019 authorized a search of plaintiff's second-floor unit.

12. The affidavit underlying the warrant was prepared by defendant Westman and included statements purportedly made by an anonymous informant that the informant had purchased narcotics from a man on the back porch of the building where plaintiff lived with her minor children.

13. The warrant affidavit did not contain any information that would support a reasonable belief that the person described by the informant as selling narcotics had been inside of plaintiff's apartment.

14. At all relevant times, only an incompetent police officer could have believed that there was probable cause to obtain the warrant.

15. Plaintiff Turner was not present during the February 8, 2019 raid.

16. TJ1, TJ2, TJ3, and TJ4 were present during the February 8, 2019 raid.

17. Many of the February 8, 2019 Officers were not in uniform and did not have any nametags identifying themselves.

18. The officers recorded portions of the raid on video.

19. The videos depict a chaotic scene in which officers moved rapidly around two small apartments.

20. As appears more fully in the video of the raid:

   a. One or more of the February 8, 2019 Officers unreasonably detained TJ1, TJ2, TJ3, and TJ4 and each of the other February 8, 2019 Officers failed to intervene to prevent the violation of rights.

   b. One or more of the February 8, 2019 Officers pointed a weapon at TJ1 and each of the other February 8, 2019 Officers failed to intervene to prevent the violation of rights.

   c. One or more of the February 8, 2019 Officers acting under the authority of the invalid warrant entered plaintiff Turner's apartment and each of the other February 8, 2019 Officers failed to intervene to prevent the violation of rights.

   d. One or more of the February 8, 2019 Officers acting under the authority of the invalid warrant searched plaintiff Turner's apartment and each of the other February 8, 2019 Officers failed to intervene to prevent the violation of rights.

21. One or more of the February 8, 2019 Officers searched plaintiff Turner's apartment in an unreasonable manner causing damages to plaintiff's possessions and each of the other February 8, 2019 Officers failed to intervene to prevent the violation of rights.

## Raid of April 25, 2019

22. Defendant Anderson obtained the warrant for the second search on April 25, 2019; Anderson and defendants Angel, Boyle, Bruno, Campbell, Cusimano, Dunn, McClelland, Miranda, Ryan, Sanchez, and Weathersby (the "April 25, 2019 Officers") executed the warrant

23. The warrant for the raid on April 25, 2019 authorized a search of the first-floor unit.

24. The officers, at all times relevant, did not have a reasonable basis to enter plaintiff's second-floor unit.

25. Plaintiff Turner was not present during the April 25, 2019 raid.

26. TJ1, TJ3, and TJ4 were present during the April 25, 2019 raid.

27. Many of the April 25, 2019 Officers were not in uniform and did not have any nametags identifying themselves.

28. The officers recorded portions of the raid on video.

29. The videos depict a chaotic scene in which officers moved rapidly around two small apartments.

30. As appears more fully in the video of the raid:

    a. One or more of the April 25, 2019 Officers unreasonably detained TJ1, TJ3, and TJ4 and each of the other April 25, 2019 Officers failed to intervene to prevent the violation of rights.

    b.    One or more of the April 25, 2019 Officers pointed a weapon at TJ1 and each of the other April 25, 2019 Officers failed to intervene to prevent the violation of rights.

    c.    One or more of the April 25, 2019 Officers, acting unreasonably under the authority of the warrant for the first-floor unit, entered plaintiff Turner's apartment and each of the other April 25, 2019 Officers failed to intervene to prevent the violation of rights.

    d.    One or more of the April 25, 2019 Officers, acting unreasonably under the authority of the warrant for the first-floor unit, searched plaintiff Turner's apartment and each of the other April 25, 2019 Officers failed to intervene to prevent the violation of rights.

31.    One or more of the April 25, 2019 Officers searched plaintiff Turner's apartment in an unreasonable manner causing damage to plaintiff's possessions and each of the other April 25, 2019 Officers failed to intervene to prevent the violation of rights.

## I.   Constitutional Claims Against Individual Defendants

32.    As a result of the above-described conduct by the individual defendants, plaintiff and her minor children were deprived of rights secured by the Fourth and Fourteenth Amendments and incurred damages.

33. The individual defendants acted with reckless or callous indifference to the federally protected rights of plaintiff and her minor children.

## II. Constitutional Claims Against Defendant City of Chicago

34. The above-described conduct of the individual defendants was carried out as a result of policies and widespread practices of defendant City of Chicago, including the following:

### A. Code of silence

35. At all relevant times, the City of Chicago has known of and has encouraged a "code of silence" among its police officers.

36. As summarized by the United States Department of Justice in its official report entitled *Investigation of the Chicago Police Department*, January 13, 2017, at 75:

   a. "One way to cover up police misconduct is when officers affirmatively lie about it or intentionally omit material facts."

   b. "The Mayor has acknowledged that a 'code of silence' exists within CPD, and his opinion is shared by current officers and former high-level CPD officials interviewed during our investigation."

   c. "Indeed, in an interview made public in December 2016, the President of the police officer's union admitted to such a code of silence within CPD, saying 'there's a code of silence everywhere, everybody has it . . . so why would the [Chicago Police] be any different.'"

37. The United States Department of Justice concluded that "a code of silence exists, and officers and community members know it." Report at 75.

38. Defendant Chicago's Superintendent of Police acknowledged that the "code of silence" continues to exist in public comments in October 2020.

39. By maintaining its code of silence, defendant City of Chicago caused its officers to believe that they could engage in misconduct with impunity because their actions would never be thoroughly scrutinized.

40. The code of silence gave the individual defendants comfort and a sense that they could violate the rights of plaintiff and her minor children and not be disciplined.

41. The code of silence emboldened the individual defendants to conduct the above-described abusive searches.

42. The code of silence caused the individual defendants to believe that they would be immune from any sanction for their wrongdoing.

43. The code of silence encourages Chicago police officers to carry out abusive searches because the officers know they will not be disciplined, and it encouraged the individual defendants to conduct the above-described abusive searches.

44. As a direct and proximate result of the City's code of silence, the individual defendants conducted the above-described abusive searches.

### B. Excessive Force Against Children of Color

45. At all relevant times, the City of Chicago has known of and has failed to end the widespread use by Chicago police officers of excessive force against children of color, which often includes pointing guns at children.

46. The 2016 report of the official Chicago Police Accountability Task Force concluded that Chicago police officers are not adequately trained or equipped to interact with children. *Police Accountability Task Force Report* at 55.

47. The United States Department of Justice, in its official report entitled "Investigation of the Chicago Police Department," determined that the Chicago Police Department has a pattern and practice of using excessive force against children for non-criminal conduct. "Investigation of the Chicago Police Department," January 13, 2017, at 34-35

48. After receiving the above-described notice of its widespread practice, the City of Chicago turned a blind eye to the continued

constitutional wrongdoing and refused to adopt policies or implement training to end the pattern and practice of using excessive force against children.

49. Rather than correct its widespread practice of constitutional wrongdoing, defendant City of Chicago has consistently failed to discipline officers who used excessive force against children, thereby authorizing, encouraging, and emboldening officers to use excessive force against children.

### C. Defective Official Directive

50. At all relevant times, the City of Chicago's directive on search warrants, Special Order S04-19, encouraged police officers to avoid verifying and corroborating information when seeking a search warrant.

51. As explained in a January 2021 report by defendant City of Chicago's Office of Inspector General, the relevant version of Special Order S04-19 distinguishes between three types of warrants based on anonymous tips and requires verification and corroboration for just one type. CITY OF CHICAGO, OFFICE OF INSPECTOR GENERAL, *Urgent Recommendations on the Chicago Police Department's Search Warrant Policies*.

52. As a result, Chicago police routinely carry out searches based on unreliable information.

53. In a letter dated January 20, 2021, Chicago Police Superintendent David O. Brown, acting in his official capacity and speaking on behalf of defendant City of Chicago, acknowledged the gaps in the City's directive on search warrants, stating that defendant City of Chicago's policies "should be amended to require a CPD member investigate and verify the information used to substantiate a search warrant."

### D. Lack of Discipline After Unconstitutional Raids

54. At all relevant times, and consistent with the Code of Silence alleged above, the City of Chicago has maintained a discipline system that is designed to sweep under the rug unconstitutional conduct that occurs during execution of search warrants.

55. In a letter dated January 20, 2021, Chicago Police Superintendent David O. Brown, acting in his official capacity and speaking on behalf of defendant City of Chicago, acknowledged the shortcomings of the disciplinary system, stating that defendant City of Chicago "intends to amend its order to expand the circumstances where officers are required to open a [misconduct] investigation."

56. As a direct result of the above-described policies and practices, Chicago police officers have conducted numerous abusive and illegal searches that terrorized minor children similar to the searches alleged herein.

57. These numerous searches include, but are not limited to the following:

    a. In August 2015, the raid of the home of Antonie Glasper;

    b. In January 2015, the raid of the home of Jolanda Blassingame;

    c. In March 2017, the raid of the home of Ashanti Franklin;

    d. In April 2018, the raid of the home of Shantail Polk;

    e. In January 2018, the raid of the home of Micaela Cruz.

### III. Claim under Federal Fair Housing Act

58. The individual defendants engaged in the above-described unconstitutional conduct in conformance with defendant City of Chicago's practice of concentrating illegal and abusive home searches in minority neighborhoods such as the Grand Crossing neighborhood (96% Black) where plaintiff resided at the time of the events alleged in this complaint.

59. Data from 2016 through 2019 shows that the overwhelming number of "negative" raids by Chicago police officers—those that fail to result in an arrest—were conducted at homes in minority neighborhoods.

60. In a May 2021 report, defendant City of Chicago's Office of Inspector General discussed several different metrics showing the racial disparities in the way that defendant City of Chicago conducts home searches. CITY OF CHICAGO, OFFICE OF INSPECTOR GENERAL, *Second*

*Interim Report: Search Warrants Executed by the Chicago Police Department, 2017-2020.*

61. The Office of the Illinois Attorney General acknowledged the racial disparity in defendant City of Chicago's searches in a letter sent to the City of Chicago Law Department on September 25, 2020:

> The right to be secure in one's home is at the core of the Fourth Amendment. There is scarcely a more violent invasion of that right than to have police officers break into a home based on bad information and hold a family, including young children, at gunpoint. The OAG is disturbed by the ongoing and well-documented accounts of CPD raids involving mistaken addresses, incorrect information, excessive force, verbal abuse, pointing guns directly at young children and their parents, and accounts of disrespect and avoidable escalation against Chicago families in their own homes. These issues are exacerbated by evidence that they disproportionately affect Black, Brown, and economically disadvantaged neighborhoods.

62. As a result of the City's practice of concentrating illegal and abusive home searches in minority neighborhoods, the individual police officer defendants interfered with plaintiff and her four minor children in the enjoyment of their dwelling because of race in violation of 42 U.S.C. § 3617.

63. Plaintiff Turner, on behalf of herself and her minor children, hereby demands trial by jury.

Accordingly, plaintiff requests that appropriate compensatory and punitive damages be awarded against the individual defendants and in favor

of plaintiff and her minor children, that appropriate compensatory damages only be awarded against defendant City of Chicago, and that the Court grant reasonable fees and costs.

>/s/ <u>Joel A. Flaxman</u>
> Joel A. Flaxman
> ARDC No. 6292818
> Kenneth N. Flaxman
> 200 S Michigan Ave Ste 201
> Chicago, IL 60604-2430
> (312) 427-3200
> *Attorneys for Plaintiff*